**In the Matter of the ESTATE of John H. BENSON, Deceased.**

**Michael BENSON, Appellant,**

v.

**Gwen ROBERSON, Appellee.**

**No. 48530.**

Supreme Court of Oklahoma.

Dec. 7, 1976.

Rehearing Denied Jan. 18, 1977.

---

5. 15 O.S.1971 § 106.

Thomas E. Baker, Shutler, Baker, Simpson & Logsdon, Kingfisher, for appellant.

Don J. Timberlake, Lamun, Mock, Featherly, Baer & Timberlake, Oklahoma City, for appellee.

BARNES, Justice.

This is an appeal by Appellant, John Michael Benson, a minor, by and through his next best friend and legal guardian, Maxine House, from an order of the Trial Court sustaining a demurrer to Appellant's Objection to Distribution of the Estate of John H. Benson. The Court ordered said estate distributed in accordance with the will, thus excluding the child of the deceased. The Trial Court further held John Michael Benson a bastard child and that the decedent did not voluntarily acknowledge paternity of Appellant in writing before a competent witness or otherwise legitimize said child through his acts, conduct, or words.

The pertinent facts are as hereinafter related. John H. Benson died testate on October 3, 1972, leaving Gwen G. Winters, now Roberson, Appellee, as his sole devisee and legatee. The Last Will and Testament of John H. Benson, deceased, was duly admitted to probate on October 24, 1972.

During his lifetime, John H. Benson, while single and approximately twenty-four years of age, was the defendant in a paternity suit filed in the District Court of Kingfisher County, Oklahoma, on July 1, 1959, by one Barbara Buie. Following a jury verdict finding defendant guilty as charged, the Court decreed the defendant to be the "father of John Michael Benson, the bastard child of Barbara Buie." On February 10, 1960, the County Court of Kingfisher County ordered John H. Benson to support the male child born to Barbara Buie, by making payments of $100.00 per month. In that proceeding, John H. Benson denied paternity of John Michael Benson, Appellant herein; but made support payments for several years pursuant to the Court's order. Thereafter, a Motion to Modify was filed and a lump sum settlement of $5,500.00 was entered into, relieving him of further support of John Michael Benson.

It was stipulated in the instant case that were attorney Harry C. Evans to testify he would state he prosecuted the aforementioned paternity complaint before a jury as County Attorney of Kingfisher County and was subsequently retained as private counsel by John Benson for the purpose of negotiating a settlement of all claims of John Michael Benson, the bastard child, and his natural mother, Barbara Buie. It was fur-

ther stipulated Evans would testify that decedent never acknowledged paternity during the prosecution of the bastardy complaint, during the settlement negotiations, nor at any time thereafter.

Following the paternity suit, Appellant remained in the custody of his natural mother until her death in 1971 and subsequently was supported by his maternal aunt in California.

While John H. Benson's estate in itself consisted of assets of a relatively nominal amount, he was the sole beneficiary of his mother's estate, Ruth Hildreth Benson. This estate consists of numerous mineral interests in several Oklahoma Counties, a 100-acre farm in Kingfisher County, Oklahoma, approximately $22,000.00 cash, and certain stocks and personal properties.

After the death of John H. Benson became known, Appellant's maternal grandmother was appointed his guardian in Oklahoma and filed an Objection to Final Account and Distribution of Assets of John H. Benson. From an adverse ruling therein, Appellant brings this appeal.

Appellant first contends that he is the child and sole heir of John H. Benson and therefore entitled to the distribution of the entire estate. Appellant relies in part on the deposition testimony of John H. Benson and Ruby Taylor. Ruby Taylor, the maid who worked for Ruth Hildreth Benson for twenty years and knew her son, John H. Benson, from the time he was a small boy, testified:

"Q. Did John ever talk to you about that baby, Mrs. Taylor?

"A. He said, yes, it was his baby, he was pretty darn sure it was his baby."

Her testimony further reflects that Barbara Buie stayed in Ruth Hildreth Benson's house for several months before the baby was born. Deposition testimony of John H. Benson reflects that in 1957 he had sexual relations with Barbara Buie several times a week when they were dating steadily.

Appellant urges the applicability of 84 O.S.1971, § 132, which provides:

"When any testator omits to provide in his will for any of his children, or for the issue of any deceased child unless it appears that such omission was intentional, such child, or the issue of such child, must have the same share in the estate of the testator, as if he had died intestate, and succeeds thereto as provided in the preceding section."

We find from our review that the will of John H. Benson exhibits nowhere an intention to omit Appellant herein.

However, other statutes pertinent to this case are 84 O.S.1971, § 215:

"Every illegitimate child is an heir of the person who in writing, signed in the presence of a competent witness, acknowledges himself to be the father of such child; . . . and inherits his . . . estate, . . . in the same manner as if he had been born in lawful wedlock; . . ."

and 10 O.S.1971, § 55:

"The father of an illegitimate child by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such, and such child is thereupon deemed for all purposes legitimate from the time of its birth. The status thus created is that of a child adopted by regular procedure of court. . . ."

For legitimation, Appellant relies primarily on the case of *In the Matter of the Estate of Allison LaSarge, deceased,* 526 P.2d 930 (Okl.1974), in which this Court said:

"The policy of the law is to favor legitimation of children born out of wedlock. The severity with which the law formerly dealt with illegitimate children has been tempered both by statute and judicial construction. The effect of legitimating a child under 10 O.S.1971 § 55 is to make such child legitimate from

birth and to give the child the right of inheritance."

In the *LaSarge* case, supra, the father of the child had a paternity case filed against him and entered a guilty plea thereto. The Court held the illegitimate child did inherit from his father by virtue of the father's having complied with 10 O.S.1971 § 55, supra. The Court referred to the fact there was a public record of the paternity proceedings and said therein:

"It would seem that the plea of guilty was sufficient to constitute public acknowledgment. It is a matter of public record regardless of the other actions of decedent."

Appellant suggests that the deposition testimony of John H. Benson, the maid, Ruby Taylor, and the appearance docket indicating support payments made by Appellant, including the final lump sum payment of $5,500.00, constitutes public acknowledgment by John H. Benson that Michael Benson was his child. He relies on the following language from the *LaSarge* case, supra:

"There is no express definition in the statute of the phrase 'public acknowledgment', but the phrase has been generally employed in the ordinary or commonly understood sense of disclosing facts of paternity without concealment to relatives, friends, acquaintances, and other third persons. It is generally held that the recognition need not be universal or so general and public as to have been known by all. *Trier v. Singmaster,* 184 Iowa 307, 167 N.W. 538, 541 (1918)."

While Appellant argues that the appearance docket and trial·docket journal are public records and may constitute a public acknowledgment, the record reflects Appellant has wholly failed to produce an instrument in writing acknowledging paternity which would invoke the provisions of 84 O.S.1971 § 215, supra.

Furthermore, after carefully reviewing the *LaSarge* case, supra, we find it to be distinguishable from the case at bar in that there a plea of guilty was entered to a bastardy complaint, while in the instant case John H. Benson entered a plea of not guilty. Moreover, the putative father in *LaSarge* legitimized the child by his conduct publicly and by his actions, including acknowledgment·of paternity to the Court, a priest, various relatives, and merchants in the town.

10 O.S.1971, § 55 was construed by this Court in *Thompson v. Thompson,* 177 Okl. 437, 60 P.2d 615 (Okl.1936), where we said in the first and second syllabi:

"1. To establish claim of legitimation, claimant must establish illegitimacy, paternity, that father publicly acknowledged claimant to be his children during minority, reception into father's family with wife's consent given with knowledge of illegitimacy, and treatment of claimant as legitimate.

"2. The burden of proof to establish all elements of legitimation is upon the claimant."

In *Hunter v. Hunter,* 206 Okl. 573, 244 P.2d 1140, we alluded to the sufficiency of evidence of public acknowledgments:

"While there is some evidence that he acknowledged to certain individuals that he was the father of the child, yet he never did so publicly. Also the appellant's mother, and others, gave evidence of such public acknowledgment, and acceptance into her home while deceased purportedly lived with her in the alleged common-law marital relationship but such evidence, if true, was insufficient."

. Appellant also contends the payments of 'support in settlement of the bastardy proceeding indicate acknowledgment of paternity. Those monthly payments were made as a result of the Court's order and thus could not be considered voluntary support. We do not think the bastardy proceeding reflects an acknowledgment of paternity but merely settlement of the obligations imposed by reason of the adverse finding to John H. Benson in the proceeding.

Regarding the issue of equating a judicial determination of paternity to a public acknowledgment of a child by a putative father, we find no decisions reported in this jurisdiction. However, we find the following cases from other jurisdictions highly persuasive.

In the California case of *In re Estate of Ginochio,* 43 Cal.App.3d 412, 117 Cal.Rptr. 565 (1974), the Court had occasion to apply California Civ.Code, § 255, which is almost identical to 84 O.S.1971 § 215. In that case the putative father denied paternity and in a subsequent trial the issue was again contested. The paternity action against Edward Ginochio was determined adversely to the putative father and judgment established paternity and ordered support. Thereafter, Edward Ginochio died testate leaving a will dated after the paternity action, which instrument omitted the illegitimate child. The child contended that a judicial determination of paternity is equivalent to an acknowledgment by the father in writing within the meaning of California Civ.Code, § 255. The Court of Appeals, in affirming a decision of the Superior Court, stated:

"While paternity is a precondition of legitimation by adoption under Civil Code, section 230, and the judicial determination thereof is conclusive in such a proceeding (*Adoption of Pierce* (1971) 15 Cal.App.3d 244, 249, 93 Cal.Rptr. 171; *Garcia v. Garcia* (1957) 148 Cal.App.2d 147, 306 P.2d 80), it is to be observed that the establishment of paternity is neither a statutory requisite to obtain inheritance rights under section 255, nor can it serve as a substitute for the statutory mandate which requires in clear and unequivocal terms that the father acknowledge 'himself to be the father' in writing, signed in the presence of a competent witness. In light of the clear statutory language, *appellant's contention that the judicial determination of paternity should be equated with the public acknowledgment of the child, which by definition postulates a voluntary act on*

*the part of the father, is contrary to law* (cf. *In re Estate of Pakarinen* (1970) 287 Minn. 330, 178 N.W.2d 714, 715, app. dism., 402 U.S. 903, 91 S.Ct. 1384, 28 L. Ed.2d 644), *and cannot be accepted."* (Emphasis ours)

The California Court then considered the issue of whether the putative father acknowledged the child in the prescribed statutory fashion so as to legitimate the child for inheritance purposes:

"The foregoing discussion inevitably leads to the conclusion that the legal issue of whether or not appellant became Edward's heir does not turn on the judicial determination of paternity, but rather on the factual question whether or not he was acknowledged by Edward in the prescribed statutory fashion. To this question the record at hand gives a definite and unequivocal answer. It shows beyond any shred of doubt that Edward was declared Seane's father against his own will. He denied paternity in the action which was brought by Marietta to establish the parent-child relationship. Although he paid the child support ordered by the court, at no time did he admit that he was Seane's father. He never lived with or visited the child, the child was never received into his family, and Edward never signed any writing acknowledging publicly or privately that he was the father of the child. In view of this record, we are compelled to hold that appellant has not been legitimated in any manner authorized by law and therefore failed to qualify as Edward's heir under section 255."

In the case of *In Re Karger's Estate,* 253 Minn. 542, 93 N.W.2d 137 (1958), the Minnesota Supreme Court said in the fifth syllabus:

"5. An adjudication of paternity does not of itself create any right of inheritance by a child from his putative father and such adjudication is not the equivalent of a written declaration of paternity as prescribed in § 525.172."

In that case involving paternity proceedings a jury adjudged the decedent to be the father of appellant. Again the Court had before it a statute similar to Oklahoma's Section 215, requiring that the illegitimate child could inherit from the father only if the latter had in writing acknowledged he was the child's father before attesting witnesses.

We find Appellant's position is not supported by the facts herein or law. We conclude the Trial Court was correct and should be affirmed.

Affirmed.

WILLIAMS, C. J., and DAVISON, BERRY and SIMMS, JJ., concur.

HODGES, V. C. J., and IRWIN, LAVENDER and DOOLIN, JJ., dissent.

DOOLIN, Justice, dissenting.

The *Ginochio* decision upon which the majority relies is not by any standard entitled to universal persuasion among jurisdictions. By relying on this California appellate court decision and thus avoiding an equal protection argument, the majority carefully ignores the line of cases handed down by the United States Supreme Court wherein that Court has held an illegitimate child may not be denied a cause of action for wrongful death of his mother because he is illegitimate,[1] has struck down a work-

men's compensation statute which gave legitimate children a prior claim to recovery over illegitimates,[2] invalidated a Texas law which denied to illegitimate children the right to paternal support while granting it to all legitimate children,[3] refused to accept a state supported welfare program that discriminated against illegitimate children,[4] held that refusal to allow an unwed father to show his fitness to have custody of his child is a denial of equal protection,[5] and held that provision of Social Security Act under which only certain illegitimates are allowed disability benefits was discriminatory.[6]

Although the constitutional issue is not expressly defined in appellant's briefs, the anathema of illegitimacy is of such critical character because of the rising number of out of wedlock births,[7] that public interest and welfare requires us to consider whether the interpretation placed on the pertinent Oklahoma Statutes by the majority violates the equal protection requirements of the United States Constitution.[8]

Apparently the majority feels that 84 O.S.1971 § 213 applies only to legitimate children unless the father of an illegitimate has complied with the directive of 84 O.S. 1971 § 215, or the illegitimate seeks to take from his mother. § 215 does not make a child legitimate. It provides one method of proving paternity. I do not believe it is meant to be the exclusive manner.[9] A ju-

1. *Levy v. Louisiana*, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968) ; *Glona v. American Guarantee & Liability Insurance Co.*, 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968).

2. *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972).

3. *Gomez v. Perez*, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973).

4. *New Jersey Welfare Rights Organization v. Cahill*, 411 U.S. 619, 93 S.Ct. 1700, 36 L.Ed.2d 543 (1973).

5. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

6. *Jimenez v. Weinberger*, 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974) ; But

*cf. Mathews v. Lucas*, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976). Read together these two decisions comprise a portrait of obfuscation on this critical issue of exactly where the illegitimate child stands in relation to his otherwise statutory and constitutional rights.

7. U.S. Bureau of the Census, Statistical Abstract of the United States: 1975 (96th edition) Washington, D.C., 1975 advises us that in 1973 the percentage of illegitimate live births in the United States had risen to 13%.

8. *Simons v. Brashears Transfer & Storage*, 344 P.2d 1107 (Okl.1959).

9. If a father pleads guilty to a paternity charge or otherwise publicly acknowledges a child, the child becomes legitimate by

dicial determination that a child is the child of a particular man should be a judicial determination for all purposes. It is illogical a child could be a child for one purpose but not for another. There appears to be little doubt that appellant is, as a matter of *fact*, the natural child of deceased. As a matter of *law* he is the child of deceased by virtue of the judicial determination. Where, as here, paternity is established, legitimacy should be irrelevant. The reason for requiring acknowledgment by the father would no longer exist, or be necessary.

§ 215, allows every child to be an heir of his mother, and provides a method of assuring that the child is really the child of his father before granting him the status of heir.[10] It must be read as the Legislature's method of preventing fraud, while rectifying the common law prohibition against inheritance by all illegitimates.

The intent of the Legislature was not to *prevent* an illegitimate child from inheriting, but to provide a method of proof of parenthood to *allow* him to inherit while preventing fraudulent claims. The cardinal rule of statutory construction is to give effect to legislative intention.[11]

If 84 O.S.1971 § 213 read in conjunction with § 215 is deemed to include all illegitimate children whose parenthood has been proved, then it does not violate the equal protection requirement.[12] Legislation must be read in the spirit of the Constitution.[13]

Unlike Oklahoma, all states have not provided for inheritance by illegitimates. In *Labine v. Vincent,* 401 U.S. 532, 91 S.Ct.

1017, 28 L.Ed.2d 288 (1971), by a 5–4 decision with a strong dissent, a Louisiana Statute which prohibited inheritance by an illegitimate child from *either* the mother or the father was upheld because the Court felt such discrimination had a rational basis in view of state's interest in promoting family life and directing the disposition of property left within the state.

This is not the policy endorsed by our Legislature. Although our statutes, unlike Louisiana's, do not subscribe to this type of total discrimination, the majority would hold our statutes permit all children to inherit from their mother, but only legitimate children and illegitimate children whose father has acknowledged them in writing to inherit from their father. This interpretation is unreasonably and invidiously discriminatory, even under *Labine.*

In *Ginochio,* cited by the majority as good authority, the will of deceased father affirmatively showed he intended to disinherit his illegitimate child. Such is not the case here. If deceased had intended to disinherit his child he had ample opportunity to include such provision in his will. He did not choose to do so. Appellant is a pretermitted heir.

There is a consistent thread running through the cited United States Supreme Court decisions. Discrimination must have a reasonable basis. The majority's unwarranted interpretation of our statutes has none. Our statutory scheme under §§ 213 & 215 does not deny the appellant the right to inherit as an heir. Because there is no real doubt as to his paternity there is no

---

virtue of 10 O.S.1971, § 55, and thus is entitled to inherit from his father. See in the matter of the *Estate of LaSarge,* 526 P.2d 930 (Okl.1974). Although we disagree with majority's holding that appellant was not deemed to be legitimate because of the judicial determination of paternity and his subsequent actions, this is not the real basis of this dissent.

10. We deal not with that portion of 84 O.S. 1971 § 215 that states: "but he does not represent his father or mother by inheriting any part of the estate of his or her kindred,

either lineal or collateral etc."; nor do we deal with the inheritance from a decedent to the *lawful* issue of a deceased child.

11. *Chapman v. Koenig,* 205 Okl. 402, 238 P.2d 357 (1951).

12. See *Green v. Woodard,* 40 Ohio App.2d 101, 318 N.E.2d 397 (Ohio 1974); Equal Protection—Descent and Distribution—Illegitimates, 44 Cinn.L.Rev. 415 (1975); Illegitimacy and Equal Protection, 49 N.Y.U. L.Rev. 479 (1974).

13. *Thomas v. Reid,* 142 Okl. 38, 285 P. 92 (1930).

reasonable basis on which to exclude him. I therefore dissent.

I am authorized to state that HODGES, V. C. J., IRWIN and LAVENDER, JJ., concur in the views herein expressed.